THE PEOPLE OF THE STATE OF NEW YORK ex rel. GEORGE W. BRYANT, Appellant, v. CHARLES F. ZIMMERMAN, Chief of Police of the City of Buffalo, and Others, Respondents.

Fourth Department, May 22, 1925.

Associations — unincorporated associations having membership of twenty or more persons — habeas corpus to release relator who was charged with attending meeting of and remaining member of Ku Klux Klan with knowledge that association had not complied with Civil Rights Law, art. 5-A, § 53 — Civil Rights Law, art. 5-A, §§ 53 and 56, constitutional — order dismissing writ of habeas corpus affirmed.

Section 53 of article 5-A of the Civil Rights Law, which provides that an unincorporated association of twenty or more persons, which requires an oath as a prerequisite or condition of membership, other than a labor union or a benevolent order, mentioned in the Benevolent Orders Law, must file with the Secretary of State a sworn copy of its constitution, by-laws, rules and regulations, and oath of membership, together with a roster of its membership and a list of its officers, and section 56 of article 5-A of the Civil Rights Law, which makes it a crime for any person who is a member of such an organization to remain a member thereof or attend a meeting thereof, with knowledge that the association has failed to comply with the provisions of article 5-A of the Civil Rights Law, does not offend section 6 of article 1 of the Constitution of the State of New York, which provides that no person shall be deprived of life, liberty or property without due process of law, or section 1 of the Fourteenth Amendment of the Federal Constitution, which provides that no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, and that no State shall deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.

The statute in question is a proper exercise of the police power of the State, and is not invalid on the ground of unjust or arbitrary classification.

Accordingly, the statute in question is constitutional, and an order dismissing a writ of habeas corpus, sued out by the relator who was charged with attending a meeting of and remaining a member of the Ku Klux Klan with knowledge that said association had not complied with section 53 of article 5-A of the Civil Rights Law, is affirmed.

DAVIS, J., dissents, with opinion.

APPEAL by the relator, George W. Bryant, from an order of the Supreme Court, made at the Erie Special Term and entered in the office of the clerk of the county of Erie on the 7th day of November, 1924, dismissing the writ of habeas corpus issued herein.

The Attorney-General was made a party defendant pursuant to section 68 of the Executive Law (as added by Laws of 1913, chap. 442). The opinion of the Special Term is reported in *People ex rel. Bryant* v. *Sheriff of Erie County* (123 Misc. 859).

*Grass, Grass & Gerken* [*Louis E. Fuller, W. F. Zumbrunn* and *John H. Connaughton* of counsel], for the appellant.

*Guy B. Moore, District Attorney,* for the respondents.

*Albert Ottinger, Attorney-General [John H. Clogston, Deputy Attorney-General,* of counsel], for the People.

CLARK, J.:

The relator was arrested upon a warrant issued out of the City Court of Buffalo, charged with the violation of section 56 of article 5-A of the Civil Rights Law (as added by Laws of 1923, chap. 664.)

The information upon which the warrant of arrest was issued charges that relator attended a meeting of, and remained a member of an association known as Buffalo Provisional Klan of the Knights of the Ku Klux Klan with knowledge that said association had not complied with the provisions of section 53 of article 5-A of the Civil Rights Law, in that said association had failed and neglected to file with the Secretary of State a sworn copy of its constitution, by-laws, rules, regulations, oath of membership, a roster of its membership, and a list of its officers for the current year, and that said association is an unincorporated association, having a membership of more than twenty persons, which requires an oath as a prerequisite and as a condition of membership; and that said association is not a labor union nor a benevolent order mentioned in the Benevolent Orders Law of the State of New York, which are specifically excepted from the operation of the statute, the benevolent orders mentioned in the Benevolent Orders Law being recognized and approved by the terms of that statute.

The facts are not in dispute. Relator sued out a writ of habeas corpus upon the theory that the statute in question is unconstitutional and that is the only question to be determined. From an order dismissing the writ this appeal is taken.

Relator contends that the statute in question is unconstitutional for the reason that it is class legislation and wrongfully restricts the personal liberty of certain citizens and that it compels certain corporations and associations and the officers thereof to furnish evidence against themselves which might be used in a criminal prosecution against them.

Section 53 of the statute under consideration provides that corporations and unincorporated associations therein referred to shall file with the Secretary of State certain documents pointed out in the statute, and section 56 provides certain penalties for failure to do so. If such documents are filed and the required information is furnished there is no penalty and the filing would not be furnishing evidence against the corporations, associations or persons so filing in violation of section 6 of article 1 of the State Constitution. Complying with the terms of the statute would

preclude a criminal prosecution under it instead of creating a situation where the information furnished under the statute might be used in a criminal prosecution against the parties furnishing it.

Article 5-A of the Civil Rights Law, as added by chapter 664 of the Laws of 1923, consists of four sections, 53, 54, 55 and 56. The information upon which the warrant was issued does not allege any facts showing a violation of sections 54 or 55 of said statute, but rests exclusively upon that part of section 56 which makes it a misdemeanor to remain a member of, or attend a meeting of such an association with knowledge that it had failed to comply with the provisions of section 53 of said article 5-A of the Civil Rights Law.

Section 54 of said act (as added by Laws of 1923, chap. 664) has reference to resolutions concerning political matters and section 55 has reference to anonymous communications which are prohibited.

The relator is not charged with violating either of these two sections, and a reading of the act will show that they have no relation whatever to a violation of section 53 of said act.

It will, therefore, not be necessary to consider the sections not involved in the charge against relator, for the offenses pointed out in sections 53, 54 and 55 are not so related to each other that they cannot be considered separately. That is, the sections of the statute are independent of each other, and if the sections that relator is charged with violating are constitutional and valid they may be enforced (*Connolly* v. *Union Sewer Pipe Co.*, 184 U. S. 540) and the other sections may be disregarded in the discussion.

Relator complains that the exemption in said statute of labor unions and the benevolent orders mentioned in the Benevolent Orders Law is an unlawful classification in violation of section 6 of article 1 of the Constitution of the State of New York, which provides among other things that no person shall be deprived of life, liberty or property without due process of law, and of section 1 of the Fourteenth Amendment of the Federal Constitution, which provides that no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, and that no State shall deprive any person of life; liberty or property without due process of law, and that no State shall deny to any person within its jurisdiction the equal protection of the laws.

Relator also complains that the act which he is charged with violating is unconstitutional because it limits the application of its provisions to associations of twenty or more persons, because as it is claimed it is an unlawful discrimination and classification

in violation of the aforesaid provisions of the State and Federal Constitutions.

In *People* v. *Beakes Dairy Co.* (222 N. Y. 416, 429) it is said: " There is no constitutional prohibition against class legislation as such if the classification is based on some reasonable ground, and is not essentially arbitrary."

Under the police power of the State, the Legislature has the authority to enact laws applicable to particular classes having regard to the public safety and the general welfare of the people. .(*Bertholf* v. *O'Reilly*, 74 N. Y. 509, 522.)   Judge ANDREWS, writing for the court in that case, said: " The police power so called inheres in every sovereignty, and is essential to the maintenance of public order and the preservation of mutual rights from the disturbing conflicts which would arise, in the absence of any controlling, regulating authority, and has been constantly exercised by the. Legislature in a great variety of cases."

Presumably the Legislature had information of conditions which in its judgment justified the legislation here attacked as unconstitutional.   (*Matter of Stubbe* v. *Adamson*, 220 N. Y. 459, 469.)

It is a matter of common knowledge that the association or organization of which relator is concededly a member exercises activities tending to the prejudice and intimidation of sundry classes of our citizens.   But the legislation is not confined to this society.   It meets a general evil all too liable to result from the organization of such associations.

The Legislature and the courts may well take notice of matters and tendencies generally recognized among the people.   (*Muller* v. *Oregon*, 208 U. S. 412; *Brown* v. *Piper*, 91 id. 37.)

In *People* v. *Beakes Dairy Co.* (*supra*, 428) the Court of Appeals says: " If the Legislature can check impending ills before they become notorious, the courts should not say that it has acted too soon."

The Legislature has plenary power, not only to maintain order within the boundaries of the State, but also to protect itself from seditious propaganda and its citizens from malicious discrimination and wanton intimidation.   The prevention and repression of such evils is well within the legislative power and classification (provided it is not palpably arbitrary) may be resorted to in carrying out the legislative will.   This is established by a long line of authorities. (*People* v. *Beakes Dairy Co., supra; People* v. *Klinck Packing Co.*, 214 N. Y. 121; *People* v. *West*, 106 id. 293; *People* v. *Charles Schweinler Press*, 214 id. 395; *Patsone* v. *Pennsylvania*, 232 U. S. 138, 144.)

27

In the case of *People* v. *Klinck Packing Co.* (*supra*) the constitutionality of a provision of the Labor Law to the effect that every employer shall allow every employee twenty-four consecutive hours of rest in every seven consecutive days was under consideration. The statute exempted from its provisions employees of dairies, creameries, etc., numbering seven or less, and it was claimed that this was an unreasonable and arbitrary classification. The Court of Appeals in holding otherwise said (at p. 136): " The provision exempting employees of dairies, creameries, etc., numbering seven or less, seems to me to be based upon a perfectly reasonable classification and, therefore, within the legislative power."

In *People* v. *Beakes Dairy Co.* (222 N. Y. 416) the Agricultural Law restricting handling of milk or cream for shipment to any city as a business by an individual or corporation, without having an office within the State and a license, was attacked, and the court in upholding the law said, among other things: " Whatever might be said of the statute as ' class legislation ' * * * is answered by *People* v. *Havnor* (149 N. Y. 195, 205). The statute there under consideration placed barbers in a class by themselves and then subdivided the class between barbers in New York and Saratoga and barbers elsewhere for the purpose of regulating their right to work on Sunday; but VANN, J., said, ' the statute treats all barbers alike within the same localities * * *.'

" There is no constitutional prohibition against class legislation as such if the classification is based on some reasonable ground, and is not essentially arbitrary."

It is presumed that a legislative enactment is valid. (*People* v. *West*, 106 N. Y. 293, 295; *People ex rel. Simon* v. *Bradley*, 207 id. 592, 610; *People ex rel. Metropolitan St. R. Co.* v. *Tax Comrs.*, 174 id. 417, 437; *People ex rel. Kemmler* v. *Durston*, 119 id. 569, 577; *Matter of Stubbe* v. *Adamson*, 220 id. 459, 469.)

In *Radice* v. *State of New York* (264 U. S. 292) the court had under consideration a statute of this State which provided that " In cities of the first and second class no female over the age of sixteen years shall be employed, permitted or suffered to work in or in connection with any restaurant more than six days or fifty-four hours in any one week, or more than nine hours in any one day, or before six o'clock in the morning or after ten o'clock in the evening of any day."

It is also provided that the statute should " not apply to females employed in restaurants as singers and performers of any kind, or as attendants in ladies' cloak rooms and parlors, nor shall it apply to females employed in or in connection with the dining

rooms and kitchens of hotels, or in or in connection with lunch rooms or restaurants conducted by employers solely for the benefit of their own employees."

The statute (Laws of 1917, chap. 535, adding to Labor Law of 1909, § 161, subd. 3)\* was attacked on the ground that it contravened the provisions of section 1 of the Fourteenth Amendment of the Federal Constitution in that it deprived the employer and employees of their liberty of contract, and that it deprived them of the equal protection of the laws by an unreasonable and arbitrary classification.

The United States Supreme Court held that the determination of the Legislature that night work for women was detrimental to the health and welfare of women engaged in it justified its suppression, and the court also held that the statute did not deny to women the equal protection of the laws because it discriminated between cities of the first and second class and other cities and communities and did not apply to women employed in restaurants as singers and performers and to those employed in dining rooms and kitchens of hotels because it created an arbitrary and unreasonable classification. (See, also, *Packard* v. *Banton*, 264 U. S. 140; *Hayes* v. *Missouri*, 120 id. 68; *Miller* v. *Wilson*, 236 id. 373.)

In the last case the court was considering the constitutionality of the California Women's Eight Hour Labor Law of 1911, prohibiting the employment of women in certain lines of business, including hotels, and it was held that the statute was not unconstitutional as to women employed in hotels as an unwarranted invasion of liberty of contract, or as denying the equal protection of the laws on the ground of unreasonable discrimination or improper classification, the court holding: " The Legislature is free to recognize degrees of harm and may confine its restrictions to those classes where it deems the need is greatest, and if the law hits an evil where it is most felt the prohibition need not be all embracing."

In *Kvekee Coke Co*. v. *Taylor* (234 U. S. 224, 227) the court said: " It is more pressed that the act discriminates unconstitutionally against certain classes. But while there are differences of opinion as to the degree and kind of discrimination permitted by the Fourteenth Amendment, it is established by repeated decisions that a statute aimed at what is deemed an evil, and hitting it presumably where experience shows it to be most felt, is not to be upset by thinking up and enumerating other instances to which it might have been applied equally well, so far as the court can see. That is for the Legislature to judge unless the case is very clear."

---

\* Now Labor Law of 1921, § 182.— [REP.

It may be presumed that the Legislature deemed the activities of societies with an oath-bound membership liable to be detrimental to the public welfare, and in exercising its police powers in an endeavor to restrain them it was well within its powers and " for the courts to attempt to determine whether the exercise of the police power within legislative limits is wise would be contrary to our constitutional system and substitute judicial opinion for the legislative will." (*Purity Extract Co.* v. *Lynch*, 226 U. S. 192, 193.)

If the purposes of an oath-bound organization are worthy ones, there can be no good reason why it should hesitate to comply with this statute, for the fullest publicity can in no way injure or prejudice right endeavor. If, on the other hand, its purposes are seditious, insidiously subversive of our institutions, maliciously discriminative, intimidatory or criminal, then it should be regulated and restricted before great mischief has been done.

The statute in question was constitutional as a police regulation for the general welfare and safety of the people of the State.

The order appealed from should be affirmed.

Sears, J. (concurring):

The sole question involved in this appeal is the constitutionality of certain sections of the Civil Rights Law (as added by Laws of 1923, chap. 664), particularly sections 53 and 56, the significant provisions of which are as follows:

" § 53.  *  *  * Every existing membership corporation, and every existing unincorporated association having a membership of twenty or more persons, which corporation or association requires an oath as a prerequisite or condition of membership, other than a labor union or a benevolent order mentioned in the Benevolent Orders Law, within thirty days after this article takes effect, and every such corporation or association hereafter organized, within ten days after the adoption thereof, shall file with the Secretary of State a sworn copy of its constitution, by-laws, rules, regulations and oath of membership, together with a roster of its membership and a list of its officers for the current year.  *  *  *.

" § 56.  *  *  * Any corporation or association violating any provision of this article shall be guilty of a misdemeanor  *  *  *. Any officer of such corporation or association and every member of the board of directors, trustees or other similar body, who violates any provision of this article or permits or acquiesces in the violation of any provision of this article by any such corporation shall be guilty of a misdemeanor. Any person who becomes a member of any such corporation or association, or remains a member thereof, or attends a meeting thereof, with knowledge that such corpora-

tion or association has failed to comply with any provision of this article, shall be guilty of a' misdemeanor."

Obviously the justification for this enactment must be sought in that broad field of legislative authority inherent in sovereignty to provide for the life, safety, health, morals and welfare of society, generally called the " police power." Statutes adopted for such purposes usually infringe to a greater or less extent upon the liberty or property of individuals, but the guaranties of the Federal and State Constitutions in respect to liberty and property (U. S. Const. 14th Amendt. § 1; N. Y. Const. art. 1, § 6) are not absolute but reach their limit when the general welfare runs counter to their assertion. (*Health Department* v. *Rector, etc.,* 145 N. Y. 32; *Bertholf* v. *O'Reilly,* 74 id. 509.) The line is frequently difficult to draw between the valid exercise of the police power and the unconstitutional deprivation of liberty and property. (*People* v. *Williams,* 189 N. Y. 131; *People* v. *Charles Schweinler Press,* 214 id. 395; *Wright* v. *Hart,* 182 id. 330; *Klein* v. *Maravelas,* 219 id. 383.) We start in every case, however, with the presumption in favor of the constitutionality of the statute. The Legislature is endowed with wide discretionary powers to determine both whether evil threatens the general welfare and what means should be adopted to defeat it. The determination of these matters is generally legislative and not judicial. " It is a sufficient basis for legislative action if only there are reasonable grounds 'for belief that the evil may occur, and even though there be ' an earnest conflict of serious opinion on the subject.' " Judicial interference with the execution of the statute is, therefore, unwarranted unless it appears that no evil can with reason be thought to exist or to be apt to come into existence, or that the means adopted cannot with reason be considered adapted to remedy or prevent the evil, or unless the remedy is unduly oppressive or confiscatory. (*Matter of Stubbe* v. *Adamson,* 220 N. Y. 459, 469; *People ex rel. Durham Realty Corporation* v. *La Fetra,* 230 id. 429.)

Applying these principles to the present case, we must first determine whether there is an evil actually present or reasonably to be anticipated, in the existence of associations, incorporated or unincorporated, having an oath-bound membership. Although there was no legislative commission to investigate the subject before the passage of the act, yet we must assume that the Legislature did investigate and took into consideration in the enactment all matters of general or widespread notoriety and belief. (*Matter of Stubbe* v. *Adamson, supra; Safee* v. *City of Buffalo,* 204 App. Div. 561.)

The opportunity for such associations inimical to the public welfare is always present. At other times and in other countries

crime and disorder have without doubt been fostered by oath-bound societies. Witness the Camorra; the Mafia; the Boxers. Still other societies of a somewhat similar character have existed for political purposes, such as the Carbonari, the Nihilists, the Fenians, and the Tugendbund — and even for judicial purposes as in the case of the Fehmic Courts. In our own country in the late 60's and the early 70's of the last century, the well-known activities of the former Knights of the Ku Klux Klan and the Knights of the White Camelia, and of like organizations, resulted in the exercise by such bodies of a very considerable extra-legal authority, often, if we can believe the reports, by the use of intimidation and terrorism. At about the same time the disorders of the Molly Maguires occurred in the West and in Pennsylvania. (Cf. C. W. Heckethorn's Secret Societies of All Ages & Countries [2d ed.], London, 1897.) We already have on our statute books other penal laws against assemblies for purposes subversive of the principles of our government. (Penal Law, § 162.) The reputed activities at the present time of one such society are generally believed to be a cause for fear with many people. At least one other State has deemed legislation on the subject similar to that involved here to be necessary. (Louisiana Acts of 1924, No. 2.) The fundamental peril from such bodies rests in their secrecy and anonymity. If their purposes were known, if their members were subject to recognition, they would promptly become harmless and generally disappear. The Legislature in the present act, therefore, has adopted a remedy which has a direct relation to an evil which may reasonably be thought to exist or threaten. (*Safee* v. *City of Buffalo, supra; Samuels* v. *McCurdy,* 267 U. S. 188.) These mild regulatory terms of the statute are far from oppressive or confiscatory. The penal provisions quoted above are well adapted to enforce compliance.

The more serious criticism of the statute by the appellant is upon the theory that by reason of the exceptions specified in the act, the relator who attended a meeting of the Ku Klux Klan with knowledge that that association, although subject to the provisions of this act, had not complied therewith, was denied the equal protection of the laws. (U. S. Const. 14th Amendt. § 1; N. Y. Const. art. 1, § 1.) The constitutional guaranties invoked do not forbid classification. It is only when classification becomes unreasonable and palpably arbitrary that it offends the Federal or State Constitution. (*Radice* v. *New York,* 264 U. S. 292; *Adkins* v. *Children's Hospital,* 261 id. 525; *People* v. *Klinck Packing Co.,* 214 N. Y. 121; *Connolly* v. *Union Sewer Pipe Co.,* 184 U. S. 540.) The appellant in his argument here calls attention to the provision (a)

that societies of less than twenty members are not affected by the statute, and (b) that labor unions and benevolent orders mentioned in the Benevolent Orders Law are excepted from its operation. College fraternities and sororities have also been excepted by an amendment just enacted. (Laws of 1925, chap. 251, amdg. Civil Rights Law, § 53.)   I do not find that any one of these exceptions is necessarily arbitrary.   It is easy to see a reasonable basis for each.   Unless such a society has twenty members, its activities might be thought too insignificant, its influence too negligible to require regulation.   Classification based on numbers is not necessarily unreasonable or arbitrary.   (*People* v. *Klinck Packing Co.*, *supra; Matter of Europe* v. *Addison Amusements*, 231 N. Y. 105.) Labor unions have a recognized lawful purpose.   The benevolent orders mentioned in the Benevolent Orders Law have already received legislative scrutiny and been granted special privileges so that the Legislature may well consider them beneficent rather than harmful agencies.   College societies are known to be social and scholastic and may well be deemed innocuous and unimportant in the general life of the community.   The Legislature has determined that all these excepted bodies of which the purposes are known, are innocent or at least not harmful in the same way as those subject to the regulation may be or become.   I cannot say that it was wrong in this.

It is also urged that the statute requires the members of the society to give evidence against themselves, and, therefore, violates both the Federal and State Constitutions.   (U. S. Const. 5th Amendt.; State Const. art. 1, § 6.)   This is patently untenable.   Upon filing the information, the existence of the society becomes lawful.   It is a mere prerequisite to the carrying on of its functions, not a disclosure of crime or of any element of wrongdoing.   Furthermore, as to the Federal Constitution, it is well settled that the first ten Amendments were not intended to limit the powers of the State government in respect to their own people, but to operate on the National Government alone.   (*Spies* v. *Illinois*, 123 U. S. 131, 165, 166; *Matter of Mohawk Overall Co.*, 210 N. Y. 474, 478.)   Somewhat similar provisions occur in the regulation of certain business enterprises.   A person doing business under an assumed name must file a declaration in the county clerk's office.   (Penal Law, § 440.   See, also, Partnership Law of 1909, §§ 20, 21, 22; Partnership Law of 1919, § 80, as amd. by Laws of 1923, chap. 268; Id. §§ 81, 82.)   Every publisher of a newspaper, magazine or other periodical must print the full name and address of the owner in every issue.   (Gen. Business Law, § 330 *et seq.*)   Insurance and real estate brokers must register and take out licenses.   (Ins. Law, § 142, added by Laws of 1913 chap. 7,

as amd. by Laws of 1922, chap. 330; Real Prop. Law, § 440-a, added by Laws of 1922, chap. 672, as amd. by Laws of 1924, chap. 579; *Hauser* v. *North British & Mer. Ins. Co.,* 206 N. Y. 455.) None of these statutes has been attacked as compelling self-incrimination, although the validity of the last-mentioned act has been challenged as an unlawful exercise of the police power, and its validity sustained at the Special Term. (*Groetzinger* v. *Forest Hills Terrace Corp.,* 123 Misc. 274.)

This appeal does not require a consideration of sections 54 and 55 of the Civil Rights Law. If those sections contain any provision in conflict with our Federal and State Constitutions, such provisions would not affect the validity of sections 53 and 56. They are not so closely bound together as to be incapable of separation. (*Connolly* v. *Union Sewer Pipe Co., supra; Buffalo Gravel Corp.* v. *Moore,* 201 App. Div. 242; affd., 234 N. Y. 542.)

The propriety of this legislation and its necessity are not open to judicial consideration.

I find that the Legislature in enacting the statute did not transcend the limits of its power.

The order should be affirmed, with costs.

All concur in both opinions except Davis, J., who dissents in an opinion. Present — Hubbs, P. J., Clark, Davis, Sears and Taylor, JJ.

Davis, J. (dissenting):

There can be no doubt that the Legislature in enacting statutes to promote public health, safety and welfare, may make reasonable classifications and exceptions. The wisdom of such legislation will not ordinarily concern the courts in passing on the question of its constitutionality. These principles have been so often recognized and stated in judicial opinions as to render further discussion unnecessary. We may say also that in general a requirement to file documents in public offices does not invade the constitutional right that a man shall not be compelled to furnish evidence that he has been guilty of a crime.

We have here no question of regulating business or occupations in the interest of public health or welfare, so authorities dealing with those subjects are not pertinent. The question now presented goes deeper. It involves the right of the Legislature to enact oppressive and confiscatory laws, by which citizens may be denied a common right, and be subjected to unreasonable restraint and annoyance and become liable to criminal prosecution for acts long regarded harmless and innocent, where there is no manifest relation between the statute and public health, safety or welfare. In

such case the purpose of the statute must be clear, and the reason for it must depend upon something more tangible than surmise and conjecture.

The police power residing in legislative bodies is broad and far-reaching and it is with difficulty that it may be defined or its bounds definitely fixed. But it has its limitations and it may not trench too far on the general welfare and rights of citizens or on the blessings of liberty secured to us and our posterity by the Federal or State Constitution; nor unecessarily abridge the privileges and immunities we enjoy; nor deprive us of liberty or property, without due process of law. It must be conceded that there are some human relations free from legislative restriction, and some acts so innocent that they may not be made criminal by legislative fiat.

The test then must be whether the legislation is reasonable, according to common experience and judgment. If it does not meet that test, it is void. For not only is legislation which contravenes the express commands of the Constitution void, but legislation is likewise void which contravenes what the Constitution necessarily implies. (*Matter of Hopper* v. *Britt*, 203 N. Y. 144.)

The Constitution cannot protect us from our own follies whether individual or collective, but it may at times protect us·from the follies of the representatives we select when written into arbitrary, oppressive and confiscatory legislation. If this were not so, the Constitution would have no practical value, and the laws under which we live would at times represent only the caprice, the anger and the unreasoned judgment of the majority.

The right of men to organize societies and clubs, often denied by despotic governments as hostile to the State or established religion, has always been recognized here. In fact, it is more ancient than the government itself. There were voluntary· patriotic societies, and other secret societies preceding the Revolution, no doubt regarded with high disfavor by the then ruling powers and those in accord with them. Washington and many of his generals and other officers belonged to a secret society still in existence. Even in the most discouraging days of that period, we do not learn that the organization of such societies was generally regarded dangerous to the public welfare. Following the Revolutionary War other societies were formed· composed of officers and soldiers. These have been continued in existence by their descendants. Similar organizations have sprung up from other wars. If people had desired to indulge in surmise and speculation, it would have been possible to reach a conclusion that to preserve an organization of soldiers in a time of peace would be a menace to the public safety. In fact, after every war, including the last, those fears have been

dominant in the minds of timid persons, apprehensive always of events that never happen.

Organization of men into societies to promote their common interest probably began in the early guilds or trades several centuries ago. These differed from the religious orders of even earlier origin. In later years these secret societies and clubs have been devoted more to recreation, benevolence, charity and social contact. That they usually have rituals, oaths, secret signs and grips is of little significance. These mysteries no doubt make membership more attractive, but do not necessarily render them dangerous to good order. However, there is scarcely a society to-day whose secrets have not been revealed and published by unworthy or apostate members.

These societies have grown greatly in number and membership within the last generation. Some have flourished for a time and then disintegrated; others have endured. There is no doubt that practically all societies organized by American men and women for mutual benefit and intercourse, having no interest outside of or hostile to this country or its citizens, have been of great value in promoting fraternal spirit and acquaintance, and in benevolent, charitable and educational work. No doubt a majority of our male population belong to some secret society, so the question is much broader than the right of the relator or the society to which he belongs, but affects all societies and a great number of citizens.

There has at all times been some opposition to such organizations among persons naturally suspicious. In this State in the early half of the last century, one of the largest of such societies was bitterly assailed and charged with all sorts of crimes and delinquencies. A political party antagonistic to it was organized and for a time developed considerable strength. An attempt was made to proscribe the members of this society from holding political office. But the passion soon passed, and succumbed to natural moderation and good sense; and so far as I know, no legislation was required in the interest of public safety or welfare to suppress either the society or the political party which opposed it.

So, at times, to use different illustrations there has been for one reason and another considerable public hostility and clamor against such organizations as the Salvation Army, labor unions and societies like the Knights of Labor and the Socialists, but the fancied danger and the opposition passed without the necessity of repressive legislation.

These societies and associations of various kinds have so become a part of our social system that it is doubtful if legislation to abolish all secret societies, the good with the bad, would be constitutional.

There can be no doubt that societies having principles subversive to the government or peace and good order may be banned and their members forbidden to meet. It has been done in this State. (Penal Law, §§ 160–163.) There are at present statutes preventing riotous assemblages (Penal Law, § 2090 *et seq.*) and meetings of masked persons. (Id. §§ 710, 711; Code Crim. Proc. § 887, subd. 7.) My brother SEARS mentions several societies which were organized for unlawful purposes, and whose activities were inimical to peace and good order. They do not now exist, and it does not appear that any new legislation was necessary to bring their criminal activities to an end, least of all legislation of the type under consideration here.

In the main, legislation in this State, far from being hostile to such societies and voluntary associations, has encouraged and protected them. This must be due to a general recognition that they are a useful part of our social structure. It has granted the right to sue and be sued, though unincorporated. . (Gen. Associations Law, §§ 12, 13, as added by Laws of 1920, chap. 915; formerly Code Civ. Proc. § 1919.) The Benevolent Orders Law and Membership Corporations Law permit such societies to incorporate and take and hold title to property. They are protected in the use of their particular names, title and badges, and their property from impostors. (Penal Law, §§ 936, 936-a, 2240.)

Granting the right to prohibit unlawful acts on the part of individuals or societies, I recognize no right under the police power to forbid or restrain the lawful activities of either, or to harass or annoy them by compelling them with no apparent purpose, except to gratify idle curiosity, to reveal secret information lawfully acquired, and having no public interest. To justify such legislation, a menace to public safety and welfare must be manifest and the remedy afforded must be clear and have some definite relation to a recognized evil. If the Legislature may under the pretext of providing for the public welfare, compel such secret societies to file their oaths and other documents with the Secretary of State, it may, of course, at any time require the same of those now excepted and it may likewise make similar requirements relative to the vows and canons of religious orders, or the members, programs and subjects of discussion of scientific bodies in advance of meetings, and failure to so file, a crime, the Legislature being the sole judge of the necessity. There could be no useful purpose served, but great annoyance would follow such arbitrary and oppressive legislative policies.

As was said by O'BRIEN, J., in *People v. Hawkins* (157 N. Y. 1): " It is important at the outset to ascertain, if we can, the legis-

lative purpose and intent that led to the enactment." The district attorney conceded on the argument that this statute was not aimed at any particular society but was of general application. We are left uninformed why it is necessary that all existing societies aside from those excepted, and all those oath-bound that shall be organized in the future for any purpose having twenty members or more should be required to file their documents. We are not dealing alone with one that may be harmful but with all those not expressly excepted, recognized as beneficial. If it is unlawful for a man to attend a meeting of a society that may be generally recognized as subversive to public welfare, which has not filed the required documents, so also under this statute is it a crime to attend a meeting of such a society whose purposes are admittedly innocent or commendable. It seems, under the original act (recently amended) all meetings within this State of college fraternities were unlawful, and all attending members have committed misdemeanors.

The constitution, by-laws, roster and oath of a secret society are its property. The right of a man to attend a meeting is a personal right. The power to confiscate the one and infringe upon the other with the penalty of imprisonment, must find its authority in some great and compelling necessity involving public safety and welfare. The law may undoubtedly restrict the purposes of such organizations to those lawful, and forbid the organization and meetings of those unlawful. This statute does not purport to do that. When the documents are filed, meetings may lawfully be held and attended, a strange method one would say, to provide for the public safety and welfare, and prevent the organization of subversive societies and punishing persons guilty of meeting for unlawful purposes.

To call into exercise the police power, there must be, as HISCOCK, Ch. J., says, " a real evil, reasonably to be anticipated and to be guarded against, and if it appears from the face of the statute interpreted in the light of common knowledge that there is no evil or that there is no reasonable relation between the evil and the proposed remedy, or that the latter is unduly oppressive and confiscatory, the courts may pronounce the legislation unconstitutional and restrain its enforcement." (*Matter of Stubbe* v. *Adamson*, 220 N. Y. 459, 469.)

There must be also a distinction observed " between the regulation of an activity which may be engaged in as a matter of right and one carried on by government sufferance or permission." (*Packard* v. *Banton*, 264 U. S. 140, 145.)

The right of men to organize secret societies is, as I have said, an ancient one, long recognized both by custom and by law. There

is no right to organize for improper purposes and the Legislature may in the exercise of its police power define unlawful purposes and forbid the organization of societies for purposes thus made unlawful. But there is no right in the Legislature unreasonably to harass an individual or society by compelling him or it to reveal secrets in themselves innocent and of no public concern. A statute shocks the ordinary sense of justice which causes a penalty of imprisonment because a man does not at a given moment file a private paper in a certain office, or because he attends a lodge meeting where some officer has failed to file, not once but repeatedly as slight changes occur, part of its secret records, innocent in themselves, in a public office. The statute to be valid must be fundamentally reasonable. In our long legal history, with the agitation at times against secret societies to which I have adverted, it is significant that until this statute was enacted, nothing like it had ever been known in connection with repressive police powers.

To quote again from the opinion of Judge O'BRIEN in the *Hawkins Case (supra):* " The guaranty against depriving the citizen of his liberty comprehends much more than the exemption of his person from all unlawful restraint. It includes the right to engage in any lawful business, and to exercise his faculties in all lawful ways in any lawful trade, profession or vocation. All laws, therefore, which impair or trammel these rights, or impose arbitrary conditions upon his right to earn a living in the pursuit of a lawful business are infringements upon his fundamental rights of liberty, which are under constitutional protection. These rights may doubtless be affected to some extent by the exercise of the police power, which is inherent in every sovereign State. But that power, however broad and extensive, is not above the Constitution. The conduct of the individual and the use of property may be affected by its lawful and proper exercise in cases of overruling necessity and for the public good.  \*  \*  \*  But no law which is otherwise objectionable as in conflict with the fundamental guarantees of the Constitution can be upheld under the police power, unless the courts can see that it has some plain or reasonable relation to those subjects, or some of them."

The same rule that applies to the " right to earn a living in the pursuit of a lawful business " applies also to the right of man to proper recreation, and lawful association with his fellowmen.

There may not be unwarranted or arbitrary interference with property or personal rights long recognized as common and lawful even under the guise of police power or enforcing police regulations. (*Dobbins* v. *Los Angeles,* 195 U. S. 223.) There must be patent reasons to justify the State in interposing its authority, and it must

appear that the interests of the public generally, as distinguished from a particular class, require such interference; and that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals. (*Lawton* v. *Steele*, 152 U. S. 133.)

Such is the rule generally recognized, and the courts do not hesitate to declare a statute unconstitutional where there is no question of public health, public safety or public welfare apparent; and where legislation adopts the guise of the police power to accomplish some purpose ulterior to those legitimate and proper, resulting in arbitrary and oppressive restrictions of the common rights of a free people in their property, occupations, recreations and associations, such an act is void. (*People ex rel. Tyroler* v. *Warden, etc.,* 157 N. Y. 116; *Ex parte Whitwell,* 98 Cal. 73; 19 L. R. A. 727; *People* v. *Weiner,* 271 Ill. 74; L. R. A. 1916C, 775.)

Because I believe the statute fundamentally unreasonable and oppressive, using the guise of the police power to invade arbitrarily an ancient and common right, with no obvious necessity or purpose, I favor reversal of the order dismissing the writ.

Order affirmed.